

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| N.C., | ) | No. ED108207 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | 19SL-PN03448 |
| | ) | |
| Y.Q.L., | ) | Honorable Mary B. Schroeder |
| | ) | |
| Appellant. | ) | Filed:  September 22, 2020 |

Angela T. Quigless, P.J., Kurt S. Odenwald, J., and James M. Dowd, J.

## Introduction

Y.Q.L. appeals the trial court's judgment which entered a full order of protection pursuant to § 455.010[1] against him and in favor of N.C.  Y.Q.L. asserts that there was insufficient evidence that he was guilty of stalking N.C. within the meaning of § 455.010.  We affirm the judgment of the trial court because there was ample evidence N.C. was the victim of stalking by Y.Q.L., who was her former patient, in that Y.Q.L. made repeated, purposeful, and unwanted contact with N.C. in person and through email in an attempt to establish a friendly if not romantic relationship with N.C. whom Y.Q.L. referred to as his "future wife" and with whom

---

[1] All statutory references are to RSMo 2016 unless otherwise indicated.

he believed he had been in a relationship with in a previous life all of which was subjectively alarming to N.C. and would have been objectively alarming to a reasonable person.

## Background

The parties' interactions began in November 2016 when Y.Q.L. was N.C.'s patient during his 10-day psychiatric hospitalization at Barnes-Jewish Hospital in St. Louis, Missouri. At that time, Y.Q.L. repeatedly told N.C. that he wanted to have a personal relationship with her beyond their physician-patient relationship. N.C. declined.

Then N.C. saw Y.Q.L. twice – once in May 2017 and again in April 2018 – at a Thai religious temple that N.C. attended. Y.Q.L. again proposed a relationship to her which she again declined. On one of those occasions, N.C. believed Y.Q.L. had come to the temple wearing a disguise. When N.C. saw him, she ran away. And N.C. testified that she stopped going to the temple because she was concerned for her safety.

Y.Q.L. sent N.C. multiple emails from January 2018 to July 2019 to both her work and personal email accounts repeating his desires to pursue a relationship. N.C. testified that the tone of the emails became increasingly alarming and delusional. In one email, in June 2019, Y.Q.L. stated that he believed that he and N.C. had had "relationships as a couple in a past life" and that "he wants that again in his life." N.C. testified that Y.Q.L.'s reference to her as his "future wife" in another email deeply concerned her and that his conduct generally made her increasingly fearful of physical harm.

## Standard of Review

Appellate review of an order of protection is the same as with any court-tried case. *Foster v. Village of Brownington,* 140 S.W.3d 603, 607 (Mo. App. W.D. 2004). The trial court's judgment must be affirmed unless it is not supported by substantial evidence, it is against the

2

weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536

S.W.2d 30, 32 (Mo. banc 1976). "Substantial evidence is competent evidence from which the

trier of fact could reasonably decide the case." *Wallace v. Van Pelt*, 969 S.W.2d 380, 382 (Mo.

App. W.D. 1998). The reviewing court will defer to the trial court's determinations of witness

credibility, as the trial court is in a superior position to assess credibility. *Essex Contracting, Inc.*

*v. Jefferson Cnty.*, 277 S.W.3d 647, 652 (Mo. banc 2009). In adult abuse cases, this includes the

trial court's superior ability to evaluate the potential for abuse by the testimony and demeanor of

witnesses. *A.S. v. Decker*, 318 S.W.3d 751, 756 (Mo. App. W.D. 2010). And the discretion of

the trial court should not often be superseded because the trial judge is in the best position to

determine the existence of any reasonable apprehension of abuse that a petitioner may have or

whether a given respondent appears capable of the feared abuse. *Parkhurst v. Parkhurst*, 793

S.W.2d 634, 636 (Mo. App. E.D. 1990).

Nevertheless, "[b]ecause there is real harm that can result in abusing the Adult Abuse Act

and its provisions, including the stigma that may attach to a respondent who is ultimately labeled

a 'stalker,' trial courts must exercise great care to ensure that sufficient evidence exists to support

all elements of the statute before entering a full order of protection." *McGrath v. Bowen,* 192

S.W.3d 515, 517 (Mo. App. E.D. 2006). The Act is not, nor was it intended to be, "a solution for

minor arguments between adults." *Binggeli v. Hammond*, 300 S.W.3d 621, 624 (Mo. App. W.D.

2010).

Analysis

1. *Point One – The "no legitimate purpose" element.*

Y.Q.L. claims there was not substantial evidence to support the trial court's finding that

his conduct served "no legitimate purpose." We disagree. Section 455.020 provides that "[a]ny

3

adult who has been subject to abuse by a present or former adult family or household member, or who has been the victim of stalking, may seek relief by filing a verified petition alleging such abuse or stalking by the respondent." Since the parties are not family or household members, the question before the trial court and before us is whether there is substantial evidence that N.C. was the victim of stalking at the hands of Y.Q.L. *Towell v. Steger,* 154 S.W.3d 471, 473 (Mo. App. S.D. 2005). "Stalking" is defined in the Act as "when any person purposely engages in an unwanted course of conduct that causes alarm to another person . . . when it is reasonable in that person's situation to have been alarmed by the conduct." § 455.010(14). Thus, N.C.'s burden was to demonstrate that Y.Q.L. (1) engaged in an unwanted course of conduct that was (2) purposeful and repeated, and that not only (3) caused N.C. alarm, but that it was (4) reasonable that she would become alarmed.

Further, the Act defines a *course of conduct* as "a pattern of conduct composed of two or more acts over a period of time, however short, that serve no legitimate purpose." § 455.010(14)(b). For conduct to have "no legitimate purpose," it must be found to be unlawful, not allowed, or not sanctioned by law or custom. *Towell*, 154 S.W.3d at 475. "Alarm" requires proof that the petitioner was placed in "fear of danger of physical harm." § 455.010(14)(a). Proof of alarm involves both a subjective and an objective component. *Skovira v. Talley,* 369 S.W.3d 780, 784 (Mo. App. S.D. 2012). Thus, Respondent had to present substantial evidence that: (1) Appellant's conduct caused Respondent to subjectively fear physical harm; and (2) a reasonable person under the same circumstances would have feared physical harm. § 455.010.

While Y.Q.L. sought to portray his conduct as merely playful attempts to kindle a friendly if not an intimate personal relationship with N.C., the trial court concluded that the circumstances were alarming to N.C., would have been alarming to a reasonable person, and

4

constituted stalking within the meaning of the statute. We agree that all of the elements of stalking were met and supported by substantial evidence. § 455.010(14). It is undisputed that Y.Q.L. engaged in repeated acts in pursuit of N.C. over a long period of time. These were both in person and in writing and were purposeful and unwanted. N.C. repeatedly made clear she was not interested in Y.Q.L.'s entreaties. At some point, such entreaties pass the threshold between normal social interaction and stalking. Y.Q.L.'s conduct blew past that threshold at which point his alarming conduct no longer had a legitimate purpose. *See K.M.C. v. M.W.M.*, 518 S.W.3d 273, 279 (Mo. App. E.D. 2017) (finding defendant's intent to "interrogate [victim] about whether she was angry at him and to tell her he was angry at her when they had no personal relationship, along with the escalation of his behavior over time," served no legitimate purpose).

Frankly, we commend N.C.'s handling of this challenging situation in which Y.Q.L. tried to convert a physician-patient relationship with N.C. into a serious and permanent personal relationship. N.C. testified she sought to avoid antagonizing him with more forceful rejections until his behavior became increasingly alarming and delusional. We find that N.C.'s use of the Act in this case is precisely the purpose envisioned by the legislature. See *Wallace*, 969 S.W.2d at 387 (recognizing "[i]n amending the Adult Abuse Act to include stalking, our legislature responded to increased public awareness and media attention devoted to the stalking of an individual. The laudatory purpose is to prevent potential violence, and unnecessary and unjustified infliction of emotional distress."); *see also, e.g., K.M.C.*, 518 S.W.3d at 279 (ruling a dental hygienist's order of protection against a former patient who was following her with increasing hostility was within the legislature's intended purpose of the Adult Abuse Act).

2.      *Point Two – The "alarm" element of stalking*

In Point Two, Y.Q.L. claims that the trial court erred by entering a full order of protection against him because the evidence was insufficient to prove that Y.Q.L.'s conduct caused N.C. alarm within the meaning of the Act.  We disagree.

The "alarm" element of a stalking claim requires proof under § 455.010(14)(a) that the petitioner was placed in "fear of danger of physical harm."  Further, a dual finding is required– that the petitioner both *subjectively* feared physical harm and that a *reasonable person* under the same circumstances would have feared physical harm.  *Skovira*, 369 S.W.3d at 785; § 455.010(14).

As for the subjective prong of the analysis, we find there was substantial evidence that N.C. feared for her personal physical safety.  N.C. testified she stopped going to the Thai temple because she feared for her safety due to the series of emails Y.Q.L. sent her which became more and more delusional with his repeated declaration of love for her, his assertion that they had been together in a previous life, and his reference to her as his "future wife."  *See Patterson v. Pilot*, 399 S.W.3d 889, 900 (Mo. App. S.D. 2013) (holding the trial court could reasonably conclude based upon petitioner's testimony that appellant's conduct caused petitioner to fear physical harm).

Finally, we find that there was substantial evidence to support the objective prong of the analysis - that a reasonable person would have feared physical harm.  The picture painted by the record here is more than adequate to support the full order of protection.  N.C., a clinical psychiatrist, became acquainted with Y.Q.L. as his doctor while he was hospitalized for psychiatric treatment.  While we draw no conclusions from the unknown nature of Y.Q.L.'s psychiatric condition, we cannot ignore the origin of the parties' acquaintance nor can we ignore

6

Y.Q.L.'s infatuation with N.C. which grew more intense and delusional as time went on despite N.C. repeatedly communicating she was not interested in having a relationship with Y.Q.L. *See K.M.C.*, 518 S.W.3d at 279. Sufficient evidence was presented for the trial court to determine a reasonable person in N.C.'s circumstance would have been alarmed by the persistent and increasingly delusional nature of Y.Q.L.'s advances.

In short, the record supports the court's full order of protection entered in this case.

<u>Conclusion</u>

For the reasons stated above, we affirm the motion court's judgment.

_____
James M. Dowd, Judge

Angela T. Quigless, P.J., and
Kurt S. Odenwald, J., concur.

7